Dye, J.
(dissenting). In order to sustain the judgment of conviction rendered in the Court of Special Sessions of the City of Syracuse against these defendants for the sale of the book ‘ ‘ Tropic of Cancer ’ ’ in violation of subdivision 1 of section 1141 of the Penal Law, a majority of this court is about to rule that the book, however viewed, is obscene within the meaning of the statute. This ignores a fundamental and basic concept of justice that a conviction had for violation of that section, like a conviction had for the violation of any other penal statute, must rest upon proof of guilt beyond any reasonable doubt, and this must include proof beyond any reasonable doubt that this book was obscene within the meaning of the statute. "Whether the book is obscene as a matter of constitutional judgment is indeed questionable, so questionable in fact that the court below had no difficulty in setting aside the conviction, dismissing the information and remitting the fine.
That doubt still persists for, however analyzed, the decision now being rendered is no more than an expression of individual view having no support aside from its own pronouncement. Respected and eminent book reviewers have found it ‘£ not obscene the British government has announced that it will not prosecute its dissemination under the Obscene Publications Act (New York Times, April 12,1963) and wherever considered in the high appellate courts of our sister States the book has been held to be not obscene (see Zeitlin v. Arnebergh, 59 Cal. *130 2d 901; Attorney General v. Book Named “ Tropic of Cancer ”, 345 Mass. 11; McCauley v. “ Tropic of Cancer”, 20 Wis. 2d 134).
The book, first published in 1934, is to be found on the shelves of public libraries and libraries of institutions of learning. It has been and is being sold freely throughout the United States and foreign countries. In light of the acceptance by eminent men of letters, government administrators and rulings from high courts of appeal, it is reasonable to assume that, when the proprietors and employees of one of the largest retail book stores of the State sold it freely and openly across the counter, they did so believing that such sale was in harmony with contemporary community standards and in no way violative of a criminal statute. Under such circumstances scienter became an essential element of proof. That such fact can ever be established in this instance seems very doubtful in light of other judicial pronouncements on the same work by the highest courts of other States (see Zeitlin v. Arnebergh, supra; McCauley v. “ Tropic of Cancer ”, supra; Attorney General v. Book Named “ Tropic of Cancer ”, supra) as well as the pronouncements of the Supreme Court of the United States on other occasions. 2 The community cannot, where liberty of speech and press are at issue, condemn that which it generally tolerates.” (Smith v. California, 361 U. S. 147, 171.)
The concept of obscenity, as we have heretofore stated, is “ imprecise ” (Brown v. Kingsley Books, 1 N Y 2d 177, 181-182, affd. 354 U. S. 436); if a publication is to be suppressed for reasons of obscenity the question “ whether a particular work is of that character involves not really an issue of fact but a question of constitutional judgment ” (Roth v. United States, 354 U. S. 476, 497-498 [Harlan, J.]). There are no better standards available defining the meaning of the free press guarantees of the First Amendment as applied to publications than those laid down by the Supreme Court of the United States (Bantam Books v. Sullivan, 372 U. S. 58; Manual Enterprises v. Day, 370 U. S. 478; Marcus v. Search Warrant, 367 U. S. 717; Smith v. California, 361 U. S. 147, supra; Roth v. United States, 354 U. S. 476, supra; Kingsley Books v. Brown, 354 U. S. 436, supra [cf. People v. Richmond County News, 9 N Y 2d 578]). *131 Applying those guidelines to this publication — and under the Supremacy Doctrine we may not ignore them — the indicated direction all points to an affirmance of the order appealed from.
It cannot be gainsaid that the profusion of four-letter words used by the author to portray the mental and moral slough into which some of his characters had sunk is unsuited for the drawing room. In “Tropic”, as in Joyce’s “Ulysses” however, the erotic passages are “ submerged in the book as a whole and have little resultant effect ” (United States v. One Book Entitled Ulysses, 72 F. 2d 705, 707). Like “ Ulysses ”, it is a “ tragic and very powerful commentary” on the inner lives of human beings caught in the throes of a hopeless social morass. Written in Paris in 1934 at a time when Europe was reeling from the aftermath of the devastating moral and material destruction of World War I, the book reflects the debasing experiences and problems known to many in a city such as Paris in the 1930s. In an effort to escape the clutching insistence of an all-engulfing miasma, the author describes his own and his companion’s sexual indulgences, tediously repeated, to rediscover that surrender to such demeaning conduct was not the antidote to the underlying human unhappiness caused by the poverty, filth, disease, loneliness and despair in a world in flux. In dealing with Gautier’s “Mademoiselle de Maupin ” in Halsey v. New York Soc. for Suppression of Vice, (234 N. Y. 1, 4) we said “ No work may be judged from a selection of [a few] paragraphs alone. Printed by themselves they might, as a matter of law, come within the prohibition of the statute. So might a similar selection from Aristophanes or Chaucer or Boccaccio or even from the Bible ”. The book should neither be appraised nor condemned by the tone of a few passages wrested from context and viewed in a vacuum. It “ must be considered broadly as a whole ”. (Halsey v. New York Soc. for Suppression of Vice, supra, p. 4.)
When so read, its content does not meet the test of “ hard-core pornography” which we announced in People v. Richmond County News (9 N Y 2d 578, 586, supra), nor does the book contain, in the words of Mr. Justice Harlan, “ patently offensive ” material and have its predominant appeal to the “prurient interest ’ ’— the criteria enunciated by the Supreme Court in Manual Enterprises v. Day (370 U. S. 478, 486, supra).
*132 This so-called “ obscenity case ” and those that preceded it all call to mind the book burning of eighteenth-century Europe and New England which fortunately did not stop the forces of the inquisitive and curious minds for long but, as might well have been expected and as we are now witnessing, released forces which today are demanding attention throughout the democracies of the world. To hold this book obscene necessarily places one in the role of the censor, a role which is incompatible with the fundamentals of a free society and which is incompatible with the explicit powers and obvious purposes of this court. Obscenity is variously defined, but it does not follow that the printed word which is in bad taste, disgusting, and offensive is obscene as a matter of law requiring suppression by the censor, and that is what we must say beyond any reason of doubt in order to find grounds for reversal here. Such a view in no way minimizes the right of the State to suppress what is obscene and pornographic. However, when material is so characterized to charge commission of a crime, the courts should be ever-mindful before rendering a judgment of conviction that the evidence of guilt is free from reasonable doubt, else what is done in the name of the law will so fritter away the free speech and free press guarantees of the First Amendment and due process under the Fourteenth Amendment as to make the remedy more dangerous than the ill, for the effect will be to substitute the fleeting ad hoc opinion of men, whether we realize it or not, for the rule of law envisioned by the framers of the Constitution.
The order appealed from should be affirmed.